It's the city of Philadelphia. Here's the court. Armando Pandoa on behalf of the plaintiff appellants. I'd like to reserve three minutes for rebuttal. What are the genuine issues in a case in which a Philadelphia police officer shoots and kills an unarmed, totally naked African American male? Are there any circumstances, are there any facts which we can look at to help us decide whether that officer's actions were reasonable? The lower court ignored the totality of circumstances standard by looking at one fact. The only fact that the court looked at is that the police officer was attacked, shot, and then had to kill the decedent in self-defense. That's what the lower court decided. I think it is obvious that those are not the only facts that are relevant in this case. One of the most important facts is that the police officer, the minute he arrived on the scene, knew that the decedent was mentally incapacitated. He testified to that. He knew that that was true. He also knew that based on the standards that he had been taught and the training that he had been given, he had been given crisis intervention training, he knew that what he should do was get back up. I thought also the police officers' responsibility is to try to diffuse the situation, try to talk to the person whom he believed or might have believed was mentally incapacitated. But wasn't the officer trying to do that when he said, come here, come here? No, he actually gave that as a command. The decedent was walking into an apartment building. I would just like to give your Honor's answer a little context here. This officer had been there twice before. He had been there as backup. He knew that backup was required in dealing with an individual who was mentally incapacitated. Twice before that night, they had received calls that a naked man was on the street, a totally naked man. You're referring to a matter of internal policy. Where have we ever held that a violation of police department policy itself can give rise to a constitutional violation? Well, there have been cases in which it has been held that it's relevant to that. And I think that this policy is very different than most policies. This is not a procedural police directive. So, for example, a procedural directive would be, for example, in the Lamont case, where you have how should we approach someone who has entered a heavily wooded area, what should we do? Those procedures are meant really to, the best way to get a hold of this person and keep the police safe. Police Directive 136 is very different. It's a substantive directive. It was made a directive after years of looking at what the police did in confronting mentally incapacitated people and finding that in too many situations, the mentally incapacitated person was shot by the police. And so the police looked at this and said, you cannot treat this individual as you would a normal criminal. But that's not the only beneficiary of Directive 136. The main objective is identifying and protecting not only the mentally disabled person, but also innocent bystanders and family members in the immediate area. So when an officer sees someone who is mentally disabled and potentially dangerous and violent going into an apartment building, then isn't it consistent with Directive 136 for the officer to command him or seek for that individual to instead come toward the officer and not toward the innocent people inside the building? Not in these circumstances. Because we had two previous calls several hours before that this individual was walking around naked. There was no indication by anyone that he had threatened anyone, that he had tried to harm anyone, that he had done anything of that kind. Let's say you're 100% correct and the officer could have handled the circumstances a little bit better. Could have called for backup. Let's say that. But there was a point in time when the dynamics changed dramatically. And that's when Mr. Newsom in effect attacked a police officer, grabbed for his gun. And at that point, shouldn't you think of this as an intervening cause where the officer had no choice but to fire his weapon? There are two problems I think there are. First is that the actions taken by this individual were precipitated by the police officer in doing what he did. First he commanded him to come and then he shot him with a taser. So the officer started the whole thing and didn't follow proper procedure. But at some point there was a different, I mean the dynamics changed. And with regard to those dynamics, we also disagree because what happened here when that confrontation occurred, this court has many, many times looked at the other side of a civil rights case, the plaintiff, who claimed that he was severely beaten by police and have noted that this individual suffered hardly any injuries. That in fact received no hospitalization, no medical care. Although he claims to have been severely beaten by the police. I'm still wondering what is a police officer supposed to do? He was literally picked up and thrown against a patrol vehicle and then Newsom started reaching for his gun. Well, these are the circumstances that I think are very important, Your Honor. Because first, he did not receive any serious injuries. He never even got medical care for supposedly this beating and thrashing that he took. And as this court has pointed out, you know, the seated isn't there. That was pointed out by the witnesses who were there. Did the police officer get disciplined in any way by the police force for not following the regulations? Not at all. In fact, Your Honor, in looking at describing this incident in the police records, it's not even in the police records as killing a person who is mentally incapacitated. That's not even in the record in terms of what the police did. And the police did look at this. Their normal procedure is to have an investigation. They did have that investigation. Not once in that entire investigation is Police Director 136 mentioned. Let's take the last case. You heard the last case. The police officers were at the door and there was a bunch of noise inside and they had an arrest warrant. They broke the door down. They entered the apartment. Somebody in the apartment picks up a knife and starts. And let's say the search was illegal because they got the wrong apartment. Illegal search. And so the police officers were dead wrong. But they enter the apartment. Somebody picks up a knife and starts attacking one of the police officers. In that circumstance, a police officer shoots the attacker. Do you think that the officer should have immunity in that circumstance? Doesn't the officer have a right, even though they committed a wrong, to self-defense? Well, in this case, the wrong that was committed is not merely breaking in a door, which is irrelevant to the conduct of the individual with the knife. And, of course, I would agree that the officer has to protect himself in that case and perhaps use deadly force if necessary. In the present case, what precipitated this, because we have directed for 136, is the police know about this problem. They know that confronting and tasering an individual like this is going to lead to a confrontation. In my hypothetical, I'm assuming that the police were wrong in their conduct towards the person who was killed. But you cannot connect that conduct to the knife-wielding defendant because that's a knife-wielding person because that's totally unreasonable. Obviously, if the police broke down my door, I wouldn't take out a knife. How can you distinguish this from Lamont? Isn't the situation that Judge Fuentes is describing really on all fours with that, where we said it didn't matter whether or not the police chase of the defendant in that case into the woods was reasonable or not, at the point that the defendant reached into his waistband and pulled something out that they reasonably believed was a firearm, that they would have qualified immunity for shooting in self-defense? How do you distinguish that from this situation once we have the superseding event of the attack? Because in Lamont, what the court decided is that illegal actions by the police could become legal based on certain circumstances, and the opposite. Legal actions could become illegal. So, for example, the court in Lamont, while it had that one finding that the shooting was reasonable, it said that the amount of shots fired was unreasonable, and it sent it back to the court to determine that. In that case in Lamont, the procedures that were used had nothing to do with the individual, were not meant, as Directive 136 is, to deal with mentally incapacitated people. And what the court in Lamont said is you have to examine all of the circumstances, all of them. But you're not arguing here that there's an issue around the number of bullets or that the shooting, that he resorted to shooting as a matter of first resort. That's not borne out by the record. The officer tried to speak, then used a taser, then fired non-fatal shots, and when all of that failed to stop Johnson at that point, fired fatal shots. But he did all of that without backup. That's your... That's exactly my point, Your Honor, because what happens is that the police know that you should not confront an individual who's mentally incapacitated because you're going to get into a fight with that person. And when you do, you're going to win if you have the gun. So that's why they require backup. That fight would never have occurred if he had waited for backup. Did he call for backup? Never. He never even called when he was on the scene. He never called and said that he was getting out of his vehicle. So is it the violation of a police policy that would serve as a basis for liability here? Not just the violation of police policy because, as I said, there are different kinds of policies. There are different kinds of directives. What I think is true is that the Graham Standard is we have to look at all of the circumstances. There's not one case that I could find where the court said, we're going to focus in on just what happens when somebody starts confronting the police and takes out a knife or a gun. No, the court says we have to examine all of the circumstances. So, for example, in your case in which someone broke into a house, obviously if the police were not in uniform, if they were in plain clothes and they did not identify themselves as police, if they broke down a door and entered somebody's house and someone picked up a knife because they didn't have a gun and was hoping to stop a home intruder, those circumstances would make a totally different case. And that's why we have to look at the totality of the circumstances. This was a nonviolent man. They had him on their records for at least four hours. He had never once been called in as even harming or approaching someone. Unfortunately, he turned violent very quickly. Well, that's as a result of the provocation that occurred that violated the policy. That's right. It violated the substantive. And that's why I make a distinction here. These procedures weren't tactical. They were meant, as you said, to protect the police, bystanders, and the individual also. This is a very substantive policy which was ignored. And in a way, this officer, based on all that we know, created this situation because so many officers in the past have created situations exactly like this. Thank you, Mr. Pandola. Thank you, sir. We'll get you back on, everybody. Mr. Gottlieb. May it please the Court, I'm Craig Gottlieb, representing the FLE police officer, Thomas Dempsey. There are actually two independent arguments in support of affirmance here. One is that Officer Dempsey's conduct the entire time was reasonable. How could it be reasonable if he knew that he should call for backup, he knew that he should notify the police station where he was? Well, just to be factually clear, Your Honor, he did notify, he did radio when he was stopped by the passing motorist and told him of the third time that there was a naked individual, he did radio in that he was then going to go and deal with the naked motorist. And did he ask for backup? He did not say the words, can I have backup? However, and his deposition transcript reflects this, backup came automatically at that point. The word automatic is in his deposition transcript. So he didn't say, can I have backup? But backup was coming. Did he wait for backup? He did not wait for backup, no. And he knew he should wait for backup, right? Well, I think that... I mean, that was the regulation, right? I mean, someone walking around naked all night probably has mental problems. Correct. And he knew that he should not by himself approach this person. He should get at least another officer to be with him. And he didn't try to do that, did he? Well, for the last part of your question, he did not try to do that. I disagree as to whether it was unreasonable for him to fail to wait. Well, he knew it was the regulation he had to wait, right? So under the directive, the language of the directive, and I'm quoting from page 23 of the appendix, it says that an officer should attempt to de-escalate the situation through communication, comma, wait for backup. So at worst, there's an ambiguity in the directive. So what did he need to de-escalate? The fact that there was a man who was naked at 6 o'clock in the morning, flailing his arms and yelling. It was reasonable for him to get out of his car. And plus, the directive doesn't establish constitutional reasonableness. So even if he's in violation of the directive, and I don't think he is because of that first clause, the fact that he could de-escalate through communication. But even if he's in violation of the directive, Your Honor, the constitutional question doesn't depend on the directive. The constitutional question depends on reasonableness. So perhaps it doesn't entirely, but can't we look to what constitutes reasonable behavior or reasonable expectations on the part of the officer by looking to policies put in place to address a specific risk? And if an officer then disregards the policy that was there to guard against certain risks, doesn't that inform our reasonableness inquiry? It does. I would agree with that. But I do think that the policy is a 60,000-foot flyover, and that's why the policy does say it allows for both. It allows for communication, and it allows for waiting for backup. So what we're talking about here is the officer arrives on the scene, and he has a choice. He can wait for backup, or he can get out of the car, sit down here, and try and calm things down. And I'm not sure that there's a constitutional distinction between the two. I'm not sure that for the officer to simply get out of the car. I mean, things went bad, of course, and in hindsight it would have been much better if this hadn't happened, obviously. But at the moment, I'm not sure that we can call the officer unreasonable by simply getting out of the car and saying, come here. This officer had had prior interactions with this individual, with Nissen? No. But he knew he was out there because he'd been called. He'd been called twice before. Both times he went, and Mr. Nissen was not there by the time he got there either time, and they had not had any past interactions prior to this date. Is it the city's position that part of a reasonableness inquiry should also take account of the fact that Nissen was behaving in this fashion that Nissen was in the course of entering into an apartment building at the time that the officer called him back? Correct. Correct. And which brings up a whole other, you know, there could be additional dangers in there. There could be problems that could come out from the apartment building, yes. But his girlfriend, Nissen's girlfriend was outside, right? She was outside at some point in the events, yes. Yes. Is there a city policy, a police policy of dealing with persons like this who are mentally disturbed, and in this particular case under the influence of PCP? I think that's the directive 136. That's what the one was referred to before 136? I think so, yeah. I think that's what we're talking about now, and that's the one that I think creates some ambiguity and leads to the judgment of the officer. Does it impose a specific duty on the part of police officers? I'm sorry? Does it impose a specific duty or requirement on the part of police officers? Well, I'm not sure I would say that it imposes a constitutional duty, but it does give guidance to the officers to what to do with SMDPs, severely mentally, I forget the acronym. Inferior person. Disabled persons, yes. Thank you. So it provides guidance, and the guidance, as I said a couple times, is deescalate the situation through communication, wait for backup. The officer has to have some judgment at the moment, and the officer's judgment to get out of the car in this situation, say, come here, is not unreasonable. Well, isn't this a question then that has some material facts about under these circumstances what was reasonable and what was not reasonable? Shouldn't this go to a jury rather than be dismissed simply on summary judgment? I don't think so, Your Honor. I don't think we've identified any disputed facts that we've been talking about here. Well, was it reasonable for him to get out of the car and talk before backup had come? I think the appellant says it was not. For sure. I would suggest that the historical facts are all undisputed, and then the ultimate question of reasonableness is either through the court under Scott v. Harris, or if it's not always for the court, it's for the court when the reasonable jury can find in the contrary. Is it your position, in addition to the decision to get out of the car being reasonable, that it was also compliant with Directive 136 in the sense of the concern about safety of potential bystanders in the apartment building or an immediate danger that was posed to those individuals? Yes. I mean, I don't think that's necessary, but yes, it doesn't have to be compliant with 136, but it also is compliant with 136. In addition to the reasonableness argument, let's assume arguendo that the court disagrees and getting out of the car was unreasonable. The court should still affirm under Lamont. There's simply no proximate causation between the decision to get out of the car and several proximate steps later of a shooting. There were far too many steps that happened in between the decision to get out of the car and the shooting, and in some ways the distance between those two is even greater than in Lamont. But certainly Lamont, at a minimum, provides the basis for the court to affirm. Let me ask you a question. On the Seventh Circuit case, Estate of Starks v. Enyart, are you familiar with the case? Yes, sir. The case held that police officers who unreasonably create a physically threatening condition in the midst of a fourth-amendment seizure cannot be immunized by the use of deadly force, denying qualified immunity to an officer whose own unreasonable action prompted the danger he faced. It sounds like this is the circumstance in this case. Well, the officer's own conduct created the danger that the officer faced. Your Honor, I have a legal response and a factual response. The legal response is that Starks was one of the cases that was identified by the court in Abraham v. Rosso. Abraham v. Rosso said that there was Starks on the one hand, and then there was a Fourth and Fifth Circuit case on the other hand. Frayer begins with a D, Drew or something like that. But it identified a split with some courts, Fourth and Fifth, saying that a plaintiff must overcome this proximate cause link, and then Starks and an Eleventh Circuit case, a case called Gilmere, holding that if the officer starts down the road, then the plaintiff doesn't have to overcome the proximate cause link. The Abraham v. Rosso case said, we don't have to address this issue. So it left open the question in the Third Circuit at that point in time. Lamont decided that question. So Starks is not the law in the Third Circuit. Lamont says that you need to have this, where you have a superseding cause that the proximate cause chain is broken. So that's the legal answer to your question. Perhaps the easier factual answer under Starks is that Starks was a case where the officer essentially put himself in front of a car that was accelerating toward him. So the officer really left himself with no choice but to then use deadly force to save himself. So perhaps in that situation one could imagine that there would be liability on the part of the officer when the officer's immediate action is to necessitate deadly force. That was not the case in our situation. Well, but the officer shot him with a taser. Well, the officer shot him with a taser, but even that was proximately removed from the alleged unreasonableness here. The alleged unreasonableness, Your Honor, was the officer's decision to get out of the car. Well, but it was the officer's decision to get out of the car, the officer's decision to try to talk without backup, the officer's decision to shoot the taser without backup. Well, at that point, Your Honor, he didn't just shoot the taser. He shot the taser because Mr. Nussbaum was running toward him. I think that in and of itself changed the dynamic and changed the officer's calculation. He didn't simply get out of the car and shoot the taser. He got out of the car. He attempted to de-escalate, defuse the situation. Mr. Nussbaum then ran towards him. He shot the taser when Mr. Nussbaum ran towards him. By the way, Your Honor, the shooting of the taser was also an attempt to de-escalate. Most of the time when one shoots a taser, that will subdue the individual who is tased. That did not happen here, but that was another attempt to de-escalate and therefore another step in the proximate chain that the plaintiff can't overcome. So going back to your question, Judge Frontenot, I think the language in Starks when put in the context of the facts of the case is distinguishable. So for these two independent reasons, Your Honor, we ask the Court to affirm the decision. Thank you, Mr. Allen. Thank you. Mr. Pandola? Please, the Court. On the issue of Starks and Rasso, I think that those decisions do apply here, and I think that what happened in Rasso really is that, if you recall, someone was chasing someone who had stolen something from Macy's. The thief got in the car, and the police officer shot him, and the Court sent it back because it found that the lower court, wrongfully entered some re-judgment. And that's a very important point here because we are disputing facts that are in dispute. So in Rasso, what the Court said, we have to determine exactly where this officer was in relation to that car, and, of course, that applies to Starks. Where an officer jumps in front of a fleeing vehicle, you're placing yourself in a situation in which you're going to have to shoot this person, and on those grounds, obviously, it will be justified. The second thing I wanted to talk about was with regard to calling for backup. That really is not clear that he did that. In fact, he claims he did that. There's no radio transcript of that. And later in his deposition, he says, I may not have. I'm not really sure what I said. I got on radio. I don't really remember what I said. But the important thing here is that the officer who had been backup before, when police radio called out a patrol to go and find out about this naked man in the street, it called out a two-patrol, a two-person patrol to go there. And the defendant in this case was backup to that two-person patrol because radio knows that they're not going to send an individual officer to that scene. So they had to find a car with two officers in it, and that's who they sent on the previous two occasions when the defendant was there to help. And they didn't see any naked person, and they just left. And so this was the third time he went back, and this time without any backup and without waiting for any backup. Let's assume that there is a violation of policy, although we've heard some arguments to the contrary. Even so, didn't we address just that in Lamont, where the argument was it violated department policy not to set up a perimeter in the woods and have backup and have that sort of safeguard in place to prevent the risk of an individual being chased into the woods where you might have violence, where the decision to violate policy arguably provoked the response that then had the individual that they were chasing shot? I'm sorry. How is that different than the argument you're making to us today? Because Lamont expanded and said you have to look at all the circumstances. And the one fact that setting up a perimeter, it had nothing to do with what eventually occurred. It had nothing to do with the fact that this man in a heavily wooded area surrounded by police decides to put his hand into his waistband, eventually pulling out a coke pipe, but they thought obviously a gun. So that's totally different from a situation like this, where we're saying that this policy is more than just a policy. It's a directive on how to deal with mentally incapacitated people. And very similarly, if there were situations where someone, obviously we deal with children differently, obviously we deal with a lot of different people in different ways. The police are required to deal with them in different ways. For example, you can't tase your child. That's part of the police policy. So this is a substantive policy. It's not really a tactical policy, and it goes directly to why this incident occurred. It occurred because this officer ignored everything that the police department told him to do, and the result ended up being just exactly as it's been in so many hundreds of cases where police end up shooting mentally incapacitated people. Okay, Mr. Pendleton. Thank you very much for your arguments, and Mr. Gottlieb, thank you both. We'll take the case under revising.